## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

LAWRENCE B. HOLLIN, Derivatively on
Behalf of GRAFTECH INTERNATIONAL
LTD.,

                Plaintiff,

      v.

DAVID RINTOUL, QUINN COBURN,
MARCEL KESSLER, TIMOTHY K.
FLANAGAN, JEREMY S. HALFORD, HENRY
E. KEIZER, MICHEL J. DUMAS, DEBRA
FINE, JEAN-MARC GERMAIN, ANTHONY
TACCONE, BCP IV GRAFTECH HOLDINGS
LP., BROOKFIELD CAPITAL PARTNERS
LTD., and BROOKFIELD ASSET
MANAGEMENT LTD.,

                Defendants,

      and

GRAFTECH INTERNATIONAL LTD.,

              Nominal Defendant.

Case No. 1:25-cv-01248

JURY TRIAL DEMANDED

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Lawrence B. Hollin ("Plaintiff"), by and through his undersigned attorneys,
brings this derivative complaint for the benefit of nominal defendant GrafTech International,
Ltd. ("GrafTech" or the "Company"), against certain current and former members of its Board
of Directors (the "Board") and certain of its executive officers (the "Individual Defendants"
(defined below) as well as BCP IV GrafTech Holdings LP ("BCP Holdings"), Brookfield
Capital Partners Ltd. ("BCP Capital"), Brookfield Asset Management Inc. ("BCP Asset

Management") (collectively, the "Brookfield Defendants,") for their breaches of fiduciary duties and violations of 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding GrafTech, legal filings, news reports, securities analysts' reports about the Company, filings in the securities class action captioned *H Porter v. GrafTech International Ltd. et al.,* Case No. 1:24-cv-00154-DCN (N.D. Ohio) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiff on behalf of GrafTech against certain of its current and former officers and members of the Company's Board (the "Individual Defendants")[1] and the Brookfield Defendants for breaches of their fiduciary duties between at least February 8, 2019 and August 3, 2023, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2.      Headquartered in Brooklyn Heights, Ohio, GrafTech is a global manufacturer of graphite electrodes and petroleum coke, which are essential for the production of electric arc furnace ("EAF") steel and other metals.

---

[1] The Individual Defendants are David Rintoul ("Rintoul"), Quinn Coburn ("Coburn"), Marcel Kessler ("Kessler"), Timothy K. Flanagan ("Flanagan"), Jeremy S. Halford ("Halford"), Henry E. Keizer ("Keizer"), Michel J. Dumas ("Dumas"), Debra Fine ("Fine"), Jean-Marc Germain ("Germain"), and Anthony Taccone ("Taccone"). "Defendants" means GrafTech, the Individual Defendants, and the Brookfield Defendants.

3.     The Company maintains graphite electrode manufacturing facilities in Calais, France; Pamplona, Spain; Monterrey, Mexico. The Monterrey, Mexico facility (the "Monterrey Facility") is the production source of 100% of the Company's "pin stock" which is utilized to produce "connecting pins," a critical component of each graphite electrode. GrafTech also maintains a facility in St. Marys, Pennsylvania (the "St. Marys Facility"), which it idled in 2024.

4.     Throughout the Relevant Period, Defendants repeatedly characterized GrafTech's "low-cost" manufacturing plants as competitive advantages, while also touting the Company's purportedly "proactive" commitment to reducing its environmental impacts and complying with all environmental laws and regulations.

5.     But in reality, GrafTech had, for decades, failed to adhere to its ostensibly "rigorous internal environmental protection standards" at the Monterrey Facility. The Company openly ignored local environmental regulations, consistently polluting the surrounding neighborhoods with hazardous dust and other industrial emissions. By the start of the Relevant Period, this behavior had already prompted repeated warnings from local authorities.

6.     In March 2019, the Department of Sustainable Development of the State of Nuevo León (the "Department of Sustainable Development") initiated administrative proceedings against the company due to its persistent failure to control dust emissions from its manufacturing operations (the "2019 Administrative Proceedings"). The proceedings concluded with findings that: (1) GrafTech's Monterrey Facility was operating "***without the means to ensure that dust emissions are avoided***, which is mandatory as established in Article 131 section II of the Environmental Law of the State of Nuevo León, to ensure satisfactory air quality for population well-being and ecological balance;" and (2) GrafTech "***benefitted economically by evading the expense generated by the implementation of equipment or systems that guarantee avoiding the***

3

*generation of dust emissions to the atmosphere during its operation*." As a result, GrafTech was ordered to "immediately and permanently . . . carry out the necessary actions, adaptations and/or maneuvers that guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere." The company also agreed to invest over $2 million in dust collection and containment projects to address its violations of local law.[2]

7.     GrafTech disclosed the 2019 Administrative Proceedings in filings with the SEC but concealed the full extent and severity of the Company's misconduct by misleadingly characterizing the proceedings as involving "potential violations of state environmental law" and reporting that the Company had paid "certain fines that were not material to the Company." Indeed, the Company did not disclose the $2 million agreement to invest in dust collection and containment.

8.     Despite this, GrafTech continued to tout its environmental commitments and regulatory compliance while simultaneously failing to comply with the Department of Sustainable Development order and failing to follow through on its commitments to remedy the Monterrey Facility's environmental safeguards (the "Dust Emissions Misconduct"). Such failures exposed the Company to known material risks of government enforcement action and consequent disruption to its business activity at the Monterrey Facility. The Company's actions led to the filing of multiple environmental complaints, including one by the mayor of local municipality Apodaca, César Garza Villareal ("Garza") who stated that GrafTech had repeatedly signed agreements to remedy their ineffective environmental controls for over thirty years.

9.     In addition, Defendants also misled investors about material facts that directly bore on the potential impacts of any operational disruptions at the Monterrey Facility. During at least

---

[2] All emphases added unless otherwise indicated.

four earnings call beginning in August 6, 2021, Defendants represented to investors that the Company had "*de[-]risk[ed its] pin production capacity*" by opening a "pin production line" at the St. Marys Facility which was purportedly "operational" by November 5, 2021.

10.     In reality, however, the St. Marys Facility was not actually involved in any production of pins or pin stock during this time. As confirmed by a former GrafTech employee, and as the Company would later admit, GrafTech had not even begun the process of obtaining the appropriate operating permits required for pin production at the St. Marys Facility, thus leaving the Monterrey Facility as the only site capable of producing the pin stock needed for all of the Company's electrodes. The Company, therefore, remained exposed to significant risks of commercial harm in the event that the Monterrey facility's operations were disrupted.

11.     On September 16, 2022, the truth began to emerge when Defendants announced that the Monterrey Facility had been shut down following an inspection by Mexican regulators. That same day, Garza publicly announced that the shutdown followed a request from the Apodaca City Council seeking regulators' help in closing the Monterrey Facility because of its long history of noncompliance with local environmental laws and regulations.

12.     Following this news, the price of GrafTech's common stock fell by $0.45 per share, or approximately 8.5%, from a closing price of $5.30 per share on September 16, 2022, to close at $4.85 per share on September 19, 2022.

13.     On November 4, 2022, Defendants reported GrafTech's third quarter 2022 results. During an earnings call held the same day with analysts and investors, GrafTech executives admitted that the Monterrey Facility remained the only facility capable of producing pin stock and that the St. Marys Facility was not actually involved in "pin production." The Company also finally disclosed the risk that its business performance could be "significantly impacted" during the first

two quarters of 2023 if the Monterrey Facility remained closed into 2023. Following this news, the price of GrafTech common stock declined approximately 5%. The full truth remained undisclosed, however, as GrafTech failed to reveal that the closure coincided with a critical contract negotiation window and significantly depleted the Company's pin stock inventory, and thus the closure would be significant even if the Monterrey Facility reopened quickly.

14. On November 18, 2022, GrafTech announced that the Monterrey facility had been conditionally permitted to resume operations. The market and general public reacted positively to this news, given the previous misrepresentations that the closure would only have a significant impact if the Monterrey Facility *remained closed into 2023*.

15. On February 3, 2023, the Company disclosed that the temporary closure of the Monterrey Facility would nonetheless have a significant negative impact upon the Company's performance during "the ***first half of 2023***." During an earnings call held the same day, the Company revealed that although the Monterrey facility's "production of electrodes and pin stock began immediately upon the [lifting] of the suspension," the manufacturing of such products takes "several months," meaning it would "take time" to rebuild GrafTech's "pin stock inventory." Defendants further revealed the "critical" "negotiation window" that had coincided with the closure, further complicating matters. On this news, GrafTech common stock declined by approximately 15%.

16. On August 4, 2023, GrafTech reported its second quarter 2022 financial results, revealing a net loss of $8 million for the quarter, driven by a 49% year-over-year sales decline as the Company continued to be negatively impacted by the Monterrey Facility's shutdown. Defendants described the Monterrey facility's suspension as the "key driver" of the Company's continued underperformance and revealed that, contrary to their previous representations, the

impact of the "contract negotiation window" issue was not limited to the first half of 2023.

17. Following this news, the price of GrafTech common stock declined nearly 23%, to close at a price of $4.05 per share on August 4, 2023, representing a more than 73% decline from its Relevant Period high of $15.35 per share.

18. During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and/or misleading statements, including, *inter alia*, that: (1) the advantages of the Company's purportedly low cost structure were in large part due to GrafTech's blatant disregard of applicable environmental laws and regulations at the Monterrey Facility; (2) despite claiming that the Company was actively pursuing an environmentally conscious agenda set on legal compliance, it was actively engaging in such blatant disregard of applicable environmental laws and regulations; (3) the St. Marys Facility was not producing or capable of producing pin stock, and would require a minimum of 18-24 months to ramp up production thereof; (4) because the St. Marys Facility could not produce pin stock, the Monterrey Facility was the company's sole source of pin stock for all of its operations; and (5) the closure of the Monterrey Facility, the Company's sole producer of pin stock, resulted in significant, long-lasting negative consequences for the Company's business operations and performance entering 2023. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

19. In further breach of their fiduciary duties, during the Relevant Period the Individual Defendants and The Brookfield Defendants caused GrafTech to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between August 2019 and June 2022, approximately 34.7 million shares of GrafTech common stock were

repurchased, costing the Company over $400.9 million. As the Company's stock was actually worth only $4.05 per share, the price at which it was trading when markets closed on August 4, 2023, the Company overpaid for repurchases of its own stock by over $260.4 million in total.

20. While this misconduct was ongoing, three of the Individual Defendants and Defendant BCP Holdings breached their fiduciary duties by engaging in lucrative insider sales of Company common stock at artificially inflated prices, obtaining combined proceeds of over $1.5 billion.

21. As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

22. Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of GrafTech's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

24.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

25.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

26.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

27.     In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

28.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because GrafTech maintains its principal executive offices in this District, Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

*Plaintiff*

29.     Plaintiff is, and has been at all relevant times, a continuous shareholder of GrafTech common stock.

*Nominal Defendant*

30.     Nominal Defendant GrafTech is a Delaware corporation with its principal executive offices located at 982 Keynote Circle, Brooklyn Heights, Ohio 44131. GrafTech's common stock trades on the New York Stock Exchange (the "NYSE") under the symbol "EAF."

*Individual Defendants*

31.     Defendant Rintoul served as the Company's Chief Executive Officer ("CEO") and President and as a member of the Board from March 2018 until June 2022. During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Rintoul sold approximately 150,134 shares of Company common stock on inside information, for which he received approximately $1,922,839 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions complained of herein were exposed, demonstrate his motive in facilitating and participating in the scheme. Defendant Rintoul is also named as a defendant in the Securities Class Action.

32.     Defendant Coburn served as the Company's VP of Finance, Treasurer, and Chief Financial Officer ("CFO") from September 29, 2015, until November 29, 2021. Previously, Defendant Coburn served as the Company's VP of Finance and Treasurer from 2010 until 2015. Following his resignation, the Company retained Defendant Coburn as a Senior VP in an advisory role to assist the transition of Defendant Flanagan to the role of CEO until May 21, 2022. Defendant Coburn is also named as a defendant in the Securities Class Action.

33.     Defendant Kessler served as a member of the Board from June 27, 2022, until December 31, 2024. Defendant Kessler also served as the Company's CEO from June 27, 2022, until November 15, 2023. Defendant Kessler is also named as a defendant in the Securities Class Action.

34.     Defendant Flanagan has served as the Company's current CEO and President and a Company director since March 26, 2024. Previously, Defendant Flanagan served as the Company's Interim CEO and President from November 2023 until March 2024 and prior to that as the Company's CFO, Senior VP of Finance, and Treasurer from 2021 until November 2023. During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Flanagan sold approximately 3,717 shares of Company common stock on inside information, for which he received approximately $20,815 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions complained of herein were exposed, demonstrate his motive in facilitating and participating in the scheme. Defendant Flanagan is also named as a defendant in the Securities Class Action.

35.     Defendant Halford has served as the Company's Executive Vice President ("EVP") and COO since 2021. Previously, Defendant Halford served the Company as its Senior VP, Operations and Development from 2019 until 2021. During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant Halford sold approximately 55,812 shares of Company common stock on inside information, for which he received approximately $686,577 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions complained of herein were exposed, demonstrate his motive in facilitating and participating in the scheme. Defendant Halford

is also named as a defendant in the Securities Class Action.

36.   Defendant Keizer has served as a member of the Board since October 7, 2021 and has served as Chairman of the Board since 2023. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

37.   Defendant Dumas has served as a member of the Board since April 3, 2018. Defendant Dumas also serves as the Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee.

38.   Defendant Fine has served as a member of the Board since 2021. Defendant Fine also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.

39.   Defendant Germain has served as a member of the Board since October 2021, and also currently serves as a member of the Nominating and Corporate Governance Committee and the Human Resources and Compensation Committee.

40.   Defendant Taccone has served as a member of the Board since 2018. Defendant Taccone also serves as a member of the Board's Nominating and Corporate Governance Committee and as the Chair of the Human Resources and Compensation Committee.

***The Brookfield Defendants***

41.   During the Relevant Period, the Brookfield Defendants (Defendant BCP Asset Management, Defendant BCP Capital, and Defendant BCP Holdings), were the controlling shareholders of GrafTech. Immediately after the Company's second initial public offering, the Brookfield Defendants owned approximately 78% of GrafTech's common stock and thus held majority control of the Company, rendering it a "controlled company" under NYSE rules. During the Relevant Period, the Brookfield Defendants entered into an agreement with GrafTech pursuant

to which the Brookfield Defendants were granted the right to appoint the greater of 37.5% or three directors, as well as certain rights and privileges.

42. Defendant BCP Holdings is a wholly owned subsidiary of Defendant Brookfield Capital Partners incorporated in New York with a principal business address of C/O Brookfield Capital Partners Ltd., 181 Bay Street, Suite 300, Toronto, Ontario, Canada, M5J2T3. During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, Defendant BCP Holdings sold approximately 137,676,951 shares of Company common stock on inside information, for which Defendant BCP Holdings received approximately $1.6 billion in proceeds. Defendant BCP Holdings is named as a defendant in the Securities Class Action.

43. Defendant BCP Capital is the private equity division of Defendant Brookfield Asset Management and is an Ontario, Canada Corporation with a principal business address of CC/O Brookfield Asset Management Inc., Brookfield Place, 181 Bay Street, Suite, Toronto, Ontario, Canada, M5J2T3. Defendant BCP Capital is named as a defendant in the Securities Class Action.

44. Defendant BCP Asset Management is a global alternative asset management firm incorporated in British Columbia, Canada, with a principal business address of Brookfield Place, 250 Vessey Street, 15th Floor, New York, NY, 10281-0221. Per the Form 10-K Defendant BCP Asset Management filed with the SEC on March 17, 2023, Defendant BCP Asset Management trades on the NYSE and Toronto Stock Exchange ("TSX") as "BAM". Defendant BCP Asset Management is named as a defendant in the Securities Class Action.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

45. By reason of their positions as officers and/or directors of GrafTech, and because of their ability to control the business and corporate affairs of GrafTech, the Individual Defendants

owed GrafTech and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage GrafTech in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of GrafTech and its shareholders.

46.     Each director and officer of the Company owes to GrafTech and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

47.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of GrafTech, and The Brookfield Defendants as controlling shareholders, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

48.     To discharge their duties, the officers and directors of GrafTech were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

49.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of GrafTech, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

50.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

51.     To discharge their duties, the officers and directors of GrafTech were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of GrafTech were required to, among other things:

(i)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Ohio, Delaware, and the United States, and pursuant to GrafTech's own Code of Conduct and Ethics (the "Code of Conduct");

(ii)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)     Remain informed as to how GrafTech conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

15

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of GrafTech and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that GrafTech's operations would comply with all applicable laws and GrafTech's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

52.     Each of the Individual Defendants further owed to GrafTech and the shareholders the duty of loyalty requiring that each favor GrafTech's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

53.     At all times relevant hereto, the Individual Defendants were the agents of each other and of GrafTech and were at all times acting within the course and scope of such agency.

54.     Because of their advisory, executive, managerial, and directorial positions with GrafTech, each of the Individual Defendants had access to adverse, non-public information about the Company.

55.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by GrafTech.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

56.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

57.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

58.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of GrafTech was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

59.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

60.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of GrafTech, and was at all times acting within the course and scope of such agency.

## GRAFTECH'S CODE OF CONDUCT

61.     The Company's Code of Conduct "applies to employees, directors, and officers of GrafTech." The Code of Conduct "is intended to help implement the fundamental principle" that "[e]thical conduct and business success are inseparable."

62.     In a section titled "ASKING QUESTIONS AND RAISING CONCERNS," the Code of Conduct provides, in relevant part:

In addition to their other responsibilities as described elsewhere in this Code, each of the Chief Executive Officer ("CEO"), the Chief Financial Officer and Treasurer ("CFO"), the Controller, and the head of the internal audit function are responsible for:

Acting with honesty and integrity, and avoiding actual or apparent conflicts of interest involving personal and professional relationships, as described in this Code;

Disclosing to the legal department any material transaction or relationship that could reasonably be expected to give rise to such a conflict;

Ensuring that the Company's disclosure controls and procedures function properly and providing other employees of the Company with information that is full, fair, accurate, complete, objective, timely, and understandable for inclusion in filings with the SEC and in other public communications;

Complying with applicable laws, rules and regulations of all U.S. and non-U.S. governmental entities, as well as other private and public regulatory agencies to which the Company is subject; and

Reporting to the legal department any violations of this Code of which he or she is aware.

63.     In a section titled "CONDUCTING BUSINESS," the Code of Conduct provides that "[n]o GrafTech directors, officers, employees, and representatives should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice."

64.     With respect to "Environmental Protection," the Code of Conduct states:

The Company will endeavor to:

- Conduct its activities responsibly and in a manner designed to prevent accidents and pollution, and to protect the health and safety of our employees, vendors, customers and the public.
- Continually improve and integrate environmental protections into business decisions and planning activities and to design and implement policies and procedures that provide reasonable assurance that these principles are implemented.

Every employee and representative is required to:

- Conduct business in accordance with all environmental laws, rules, regulations, and corporate commitments.

- Understand the environmental consequences of what we do and look for ways to reduce or eliminate those consequences.
- Follow specified procedures, notify management of potential environmental concerns, and share ideas for continuous improvement.

You should be familiar with your site's policies regarding environmental protection. Employees have a duty to bring any unsafe environmental practices to the attention of management (see Reporting Procedures page 3).

65.     In a section concerning "COMPANY INFORMATION, RESOURCES, AND FINANCIAL DISCLOSURE," under the subheading "Complying with Insider Trading Laws," the Code of Conduct states the following, in relevant parts:

All GrafTech directors, officers, employees, and representatives are prohibited from trading in GrafTech securities while in possession of material non-public information. All material non-public information about the Company should be considered confidential information. Confidential information that may be considered material by investors may be disclosed to the public only by a designated officer of the Company (see Public Statements at page 26 for the definition of "designated officer"). Until such disclosure, material information must be held in confidence. . . . .

We must not:

- Disclose any material non-public information to any third party until such information has been broadly released to the public.
- Take any economic or personal advantage of any inside information, such as buying or selling stock or other securities of the Company or of any other company to which the inside information may pertain.
- Use non-public information for personal financial benefit or to "tip" others (including other GrafTech employees and representatives, third parties, or other individuals outside of the Company) who might make an investment decision on the basis of inside information.

Employees and representatives (and outsiders with whom they are associated) who have inside information can lawfully trade in the market once the information is made public through established channels. Directors, officers, and other designated employees who have regular access to inside information may not conduct trading of Company securities during preestablished "blackout periods."

Insider trading is both unethical and illegal, and both the U.S. Securities and Exchange Commission and U.S. Department of Justice investigate and pursue insider trading violations aggressively. For more information on insider trading, see the Insider Trading Policy. If you have questions or concerns regarding your responsibilities under the insider trading laws, contact the legal department.

66.     In the same section, under the subheading titled "Accurate Books, Records, and

Financial Disclosure," the Code of Conduct states:

> To comply with the law as well as maintain credibility with investors, lenders, customers, suppliers, regulators and others, we must consistently prepare financial and other reports accurately and fully and fairly disclose all pertinent information.
>
> To implement these standards, employees and representatives must:
>
> - Seek to ensure that Company financial, accounting and other books, reports and records accurately and fairly reflect the transactions of the Company in reasonable detail and in accordance with the law and the Company's system of internal controls.
> - Cooperate with and do not take any action to fraudulently influence, coerce, manipulate or mislead our internal and independent auditors.
> - Execute Company transactions only in accordance with management's general or specific authorizations and administrative and accounting controls.
> - Never take any action to circumvent the Company's system of internal controls.
> - Never authorize payment knowing that any part of the payment will be used for any purpose other than that described in documents supporting the payment. Of course if we incur legitimate expenses in connection with Company business, we will be reimbursed upon the filing of completed and accurately documented expense reports.
> - Never destroy, alter or conceal a document with the intent to impede an investigation, or tamper with or destroy a document with the intent to impair its availability in an official proceeding.
> - Never establish or maintain unrecorded or "off the books" funds or assets for any purpose.
>
> In addition, each of us must:
>
> - Report only the true and actual number of hours worked.
> - Record all Company funds and assets on the books of the Company at all times.
> - Retain Company records according to Company record retention policies and procedures.
>
> Also see page 19 for further information on record keeping requirements under the FCPA. Remember, if you wish to raise concerns about accounting or auditing matters on an anonymous basis, call the EthicsPoint Line or submit reports via the Electronic Reporting web link (see Reporting Procedures at page 3).

## GRAFTECH'S AUDIT COMMITTEE CHARTER

67.     GrafTech's Audit Committee Charter states that the purpose of the Audit Committee is, in relevant part:

> The Audit Committee (the "Committee") has been established by the Board of Directors (the "Board") of GrafTech International Ltd. (the "Corporation") to assist the Board in discharging and performing its duties and responsibilities with respect to oversight over the financial affairs of the Corporation and its subsidiaries, affiliates and related parties, including oversight over:
>
> - the accounting and financial reporting processes and systems of internal accounting and financial controls of the Corporation;
>
> - the integrity of financial statements and financial disclosures;
>
> - the quarterly reviews and annual independent audit of the Corporation's financial statements, the engagement of the independent auditor and the annual evaluation of the independent auditor's qualifications, services, performance and independence;
>
> - the capabilities, resources and performance of the Corporation's internal audit function;
>
> - the identification, assessment and management of financial risks and uncertainties, as well as the evaluation of the Corporation's risk and policies for risk management and assessment, artificial intelligence, cybersecurity issues and resolution of any ethics issues;
>
> - compliance with legal and regulatory requirements; and
>
> - the implementation and effectiveness of the Corporation's disclosure controls and procedures.

68.     In a section pertaining to the Audit Committee's responsibilities, under the subheading "Engagement, Oversight and Evaluation of the Independent Auditor," the Audit Committee Charter provides, in relevant part:

> 1.      Select (subject to stockholder ratification, if required by the Board), retain, approve the compensation and terms of engagement of, evaluate and assess the performance of and, as appropriate, terminate and replace the independent auditor (and the Committee shall have the sole authority to take any such action). The independent auditor shall report directly to the Committee.
>
> 2.      Review and approve procedures for the pre-approval of audit and non-audit services by the independent auditor and, as necessary, any audit services on which the independent auditor expressly relies (the "Pre-Approval Policy for Audit and Non-Audit Services").

3.      Review and, as appropriate, approve, prior to commencement, all audit services (including comfort letters in connection with securities underwritings and tax services) and all non-audit services to be provided by the independent auditor and, as necessary, any audit services on which the independent auditor expressly relies, in accordance with the Pre-Approval Policy for Audit and Non- Audit Services. The Committee shall give due consideration to whether the independent auditor's performance of non-audit services is legally permissible and compatible with the auditor's independence.

4.      Prior to commencement of the annual independent audit, review with management, the internal auditors, and the independent auditors the audit objective and the proposed scope of the audit plan and fees, including the auditor's and management's responsibilities, the areas of business to be examined, the adequacy of the personnel to be assigned to the audit and other factors that may affect the timelines of such audit, any other firms performing audit procedures, the accounting policies and procedures to be followed, special areas to be investigated and the adequacy of the program for integration of the independent and internal audit efforts.

5.      On an annual basis, evaluate the qualifications, performance and independence of the independent auditor, including review of the lead partner and taking into account the opinions of management and the head (and any other senior personnel, as appropriate) of internal audit. In connection with this assessment, the Committee shall obtain and review, at least once annually: (i) a report by the independent auditor describing (a) its internal quality control procedures,

(b) any material issues raised by the most recent internal quality control review or peer review or by any inquiry or investigation by any governmental or professional authority within the preceding five years, in each case with respect to one or more independent audits carried out by it, (c) any steps taken to deal with any such issues and (d) all relationships with the Corporation, its subsidiaries, affiliates or related parties, and (ii) any other reports, and at such frequency, as required by applicable law or the standards of the Public Company Accounting Oversight Board (United States) (the "PCAOB").

6.      Receive and review all reports prepared by the independent auditor and ensure that the independent auditor has full access to the Committee and the Board during its performance of the annual audit to report on any and all appropriate matters.

7.      Establish guidelines for the Corporation's hiring of former employees of the independent auditors, which shall meet the requirements of applicable law and the NYSE Rules.

8.      Review whether to adopt a policy of rotating the independent auditor on a regular basis or otherwise.

69.     With respect to "Financial Statements and Disclosure Matters," the Audit Committee Charter states that it is the Audit Committee's responsibility to:

9.      Review with the Chief Executive Officer, the Chief Financial Officer, the head of legal and other applicable senior executives (including members of the Disclosure Committee), the Corporation's disclosure controls and procedures, and review periodically, but in no event less frequently than quarterly, management's conclusions about the effectiveness of such disclosure controls and procedures, including any material non-compliance with them.

10.     Review, with management and the independent auditor, the Corporation's overall system of internal control, including:

> a.      management's annual assessment of the adequacy and effectiveness of the Corporation's internal control over financial reporting and the related report issued by the independent auditors;
>
> b.      any significant deficiencies or material weaknesses in the design or operation of the Corporation's internal control over financial reporting;
>
> c.      any fraud (regardless of materiality) involving management or other employees having a significant role in internal control over financial reporting; and
>
> d.      any changes in the Corporation's internal control over financial reporting during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, internal control over financial reporting.

11.     Review with the independent auditor:

> a.      the Corporation's critical accounting policies and practices;
>
> b.      any significant transactions that are outside the normal course of business or that appear unusual due to their timing, size or nature and the policies and practice that management used to account for these transactions;
>
> c.      material changes in the Corporation's selection or application of accounting principles, the effects of alternative applications or treatments of accounting principles on the Corporation's financial statements and other public disclosures, and the application or treatment preferred by the independent auditor;
>
> d.      the effect of new or proposed regulatory and accounting initiatives on the Corporation's risks and liabilities, financial statements and other public disclosures and internal controls;

e.      any material written communications between the independent auditor and management, and any difficulties the auditor may have encountered (or is encountering) in the course of its audit work, including any restrictions on the scope of work or access to requested information, and any significant disagreements with management; and

f.      any other matters that are significant to the integrity and oversight of the Corporation's financial reporting process, including any other issues required to be discussed by applicable law, PCAOB Auditing Standard No. 1301 or any other applicable standards of the PCAOB.

12.     Prepare annually the Committee's report to stockholders to be included in the annual proxy statement as required by the rules of the SEC.

13.     Review and discuss with management and the independent auditor the financial information to be included in the Corporation's Quarterly Reports on Form 10- Q, including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and any other matters required to be communicated to the Committee by the independent auditors under applicable standards of the PCAOB or applicable law or the NYSE Rules in connection with such filing.

14.     Review and discuss with management and the independent auditor the audited financial information to be included in the Corporation's Annual Report on Form 10-K (or the annual report to stockholders if distributed prior to the filing of the Form 10-K), including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and discuss with the independent auditor the results of the annual audit and any other matters required to be communicated to the Committee by the independent auditors under applicable standards of 6 the PCAOB or applicable law or the NYSE Rules in connection with such filing. Based on such review and discussion, the Committee shall determine whether to recommend to the Board that the audited financial statements be included in the Corporation's Form 10- K.

15.     Review of certain other public releases of financial information, including earnings press releases and earnings guidance provided to analysts and rating agencies (in particular, review of the use of pro forma and other non-generally accepted accounting principles ("GAAP") financial information and off- balance sheet structures).

70.     With respect to "Oversight of the Corporation's Internal Audit Function," the Audit

Committee Charter states that it is the Audit Committee's responsibility to:

16.     Review, at least annually, the resources, budget, scope, responsibilities, plans, activities, staffing, organizational structure and quality control procedures of the internal audit function, including the experience and qualifications of the senior

members of the internal audit function.

17.     Review financial and accounting personnel succession planning within the Corporation, including the appointment, performance and any replacement of the head of internal audit, and make recommendations to the Board regarding the same.

18.     Review all audits and reports prepared by the internal audit function together with management's response.

71.     With respect to "Risk Assessment," the Audit Committee Charter states that it is the Audit Committee's responsibility to:

19.     Review and discuss with management, internal audit, the finance department, the legal department and the independent auditor the Corporation's major financial risk and enterprise exposures and the steps management has taken to monitor and control such exposures, including the Corporation's procedures and any related policies with respect to risk assessment and risk management.

20.     Review and approve decisions to enter into swaps and other derivative and hedging transactions and review and discuss with management applicable policies governing the Corporation's use of swaps subject to the end-user exception under the Dodd-Frank Wall Street Reform and Consumer Protection Act.

21.     Review contingencies that could reasonably be expected to have significant impact on financial performance or condition.

22.     Oversee matters related to artificial intelligence, data protection and the security of the Corporation's information technology systems and operations, including programs and defenses against cyber threats.

72.     Under the subheading titled "Compliance Oversight Responsibilities," the Audit Committee Charter states that it is the Audit Committee's responsibility to:

23.     Establish procedures for the receipt, retention and treatment of concerns received by the Corporation regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by employees of the Corporation of such concerns (the "Whistleblower Policy"). The Committee shall review any such concerns, and shall receive reports regarding the investigation of such concerns, as described in the Whistleblower Policy.

24.     Obtain from the head of internal audit and/or the head of legal, no less frequently than quarterly, reports on the Corporation's ethics and compliance program, including confirmation that the 7 Corporation is in conformity with applicable legal requirements and the Code of Conduct and Ethics (the "Code"). The Committee shall periodically, but not less frequently than annually, review with management, including the head of legal, the implementation and

effectiveness of the Corporation's compliance and ethics program, including the Whistleblower Policy and the Code.

25.     Review, with appropriate members of management, including the head of internal audit, the head of legal and, if appropriate, the independent auditor, any correspondence with regulators or governmental agencies and all employee complaints or published reports that raise material issues regarding the Corporation's financial statements and accounting or auditing matters. The Committee shall also meet periodically, and may request to meet separately, with the head of legal and other appropriate legal staff of the Corporation and, if appropriate, the Corporation's outside counsel, to review any legal matters that may have a material impact on the Corporation's financial statements or the Corporation's compliance policies. The head of legal has express authority to communicate personally with the Committee about any such matters as appropriate.

26.     Review with the head of legal, management and the head of internal audit the procedures for monitoring compliance with laws and policies on business integrity, ethics and conflicts of interest, including foreign corrupt practice, antitrust and insider trading matters.

27.     Review with the head of legal compliance with applicable laws, including all material regulatory inquiries.

28.     In accordance with the Corporation's Related Party Transactions Policy, review and, where required, approve or disapprove the Corporation's Related Party Transactions (as defined in such policy).

29.     Review with management compliance with covenants under debt issues and credit facilities.

73.     With respect to "Finance," the Audit Committee Charter states that it is the Audit

Committee's responsibility to:

30.     Review with management and the independent auditor the Corporation's financial condition, liquidity and funding requirements, including short-term and long-term capital expenditure plans, cash position, capital structure and working capital needs.

31.     Review and, as authorized by the Board, approve the amounts, timing, types and terms of public and private stock and debt issues and credit facilities.

32.     Review with management financial planning policies and practices and financial objectives.

33.     Review reports on expenses of executive officers and directors.

34.     Review the actuarial and accounting assumptions used in determining

benefit obligations for the Corporation's defined benefit and defined contribution plans and post-employment benefit plans.

35. Review with management the Corporation's effective tax rate, uncertain tax positions, adequacy of tax reserves, status of tax audits and significant tax developments.

74. As for "Funding," the Audit Committee Charter states that it is the Audit Committee's responsibility to:

36. The Committee shall have the authority to determine the appropriate funding (which shall be supplied by the Corporation at the request of the Committee) for the payment of compensation to any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Corporation, including the independent auditor; to any Consultants engaged by the Committee; and for the payment of ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

## SUBSTANTIVE ALLEGATIONS

### *Background*

75. GrafTech is a global manufacturer of graphite electrode products that are used by the Company's customers to produce EAF steel, a purportedly greener alternative to traditional blast furnace steel.

76. GrafTech's graphite electrode manufacturing carries significant environmental and health concerns because it depends on fossil fuels byproducts, such as needle coke. The molding and cutting stage of the process, for instance, produces significant particulate and other atmospheric pollutants, which fall heavily upon communities near the Company's manufacturing facilities. Mitigation of this significant pollution and its consequent environmental and health impacts requires specialized equipment and containment strategies, including, for example, using specialized dust collectors and procedures to prevent open-air exposure of harmful materials.

77. On May 17, 2015, following a period of declining demand, GrafTech announced that it had entered into an agreement to be purchased by The Brookfield Defendants. Pursuant to

Plan of Merger Agreement, Brookfield made a cash tender offer to purchase all of GrafTech's outstanding common stock for $5.05 per share, for a total valuation of $700 million.

78.     On August August 17, 2015, GrafTech announced the acquisition had been completed, and the company was a wholly owned affiliate of Brookfield and trading of the Company's common stock on the NYSE would cease.

79.     Following the acquisition by Brookfield, the Company underwent a transformation to return it to profitability. This included "warm idling" its St. Marys Facility, which had previously been a full-scale production facility capable of manufacturing both graphite electrodes and pins from needle coke, during the second quarter of 2016. As opposed to a full shutdown, the "warm idling" would ostensibly allow the Company to restart the facility quickly should it need additional manufacturing capacity.

80.     The Company then determined to shift all of its graphite electrode manufacturing to its highest capacity and lowest-cost facilities, including the Monterrey Facility. Only the Monterrey Facility could supply connecting pins and pin stock for all the Company's manufacturing facilities. The Monterrey Facility, consequently, had to run uninterrupted for the Company to maintain its business and operational performance.

81.     On April 19, 2018, the Brookfield Defendants conducted the Company's second initial public offering. Company documents filed in connection with the offering represented GrafTech's facilities as "modern, strategically located and well-maintained," alleging the Company was well-positioned for future growth. Central to this allegedly growth-oriented position, the Company claimed in the offering materials, was the global shift to "more environmentally friendly" EAF steel production.

82.     In the offering, the Brookfield Defendants sold approximately 35 million shares

29

(approximately 12% of its equity stake) at $15 per share, for gross proceeds of approximately $525 million. Brookfield also sold an additional 3.1 million shares pursuant to a partial exercise of the underwriters' overallotment option for an additional $46 million. None of the proceeds from these sales went to the Company but instead went to The Brookfield Defendants, who also caused GrafTech to enter into an agreement to pay The Brookfield Defendants a $160 million special cash dividend in connection with the IPO, conditioned upon the Company's financial results, among certain other factors.

83.     Prior to and through the Relevant Period, Defendants repeatedly touted the Company's competitive advantages throughout the Relevant Period, telling investors that they had an "on-going commitment to rigorous internal environmental protection standards" and adhered to a strong "environmental management system. . . anchored by policies and procedures that allow us to operate in compliance with our regulatory obligations, identify risks, and understand and reduce our environmental impacts." Defendants further claimed that their "sustainability strategy" was executive-led and encompassed emission reduction efforts including "control technology on equipment on all of our sites," and that the Company was being "proactive to improve [its] environmental footprint."

84.     In reality, however, the Company's purported cost leadership had in substantial part been achieved through the failure to implement requisite environmental safeguards at the Monterrey Facility, leaving it open to known material risks regarding government enforcement action and consequent business and operational derailment.

85.     In March 2019, Department of Sustainable Development determined that GrafTech's Monterrey Facility violated provisions of the Environmental Law of the State of Nuevo León by operating "without the means of control to ensure that dust emissions are avoided," and

that the Company had "benefitted economically by evading the expense generated by the implementation of equipment or systems that guarantee avoiding the generation of dust emissions to the atmosphere during its operation." The Department of Sustainable Development, in connection with the proceeding's resolution, issued an order stating, in relevant part:

> ***[I]mmediately and permanently***, [GrafTech] must carry out the necessary actions, adaptations and/or maneuvers that guarantee avoiding the generation of emissions of dust or any other contaminant to the atmosphere during the development of the activities carried out in the establishment in question.

86.     In connection with the proceedings, GrafTech agreed to invest over $2 million in dust collection and containment projects to remedy its violations.

87.     On March 11, 2020, Garza, mayor of local municipality Apodaca, and Andres M. Canto Ramirez ("Ramirez"), Apodaca's Secretary of Urban Development, Ecology, and Transportation, filed a complaint against GrafTech with the Secretary of Sustainable Development for the Nuevo León State Government, claiming that the Company "constantly and continuously generate[s] emissions of fine graphite and coal dust that is deposited on streets, roofs, floors, garages and the flat parts of houses that are generated by the activities [of the Company]; this affects and decreases both the health of the neighbors and the surrounding environment."

88.     The March 2020 complaint requested the State of Nuevo León's Attorney General's Office to, among other things, consider the Company's actions as identified in the complaint to be violations of applicable law and human, initiate proceedings and investigations into the Company's alleged misconduct, and, importantly, order the total stoppage of the Monterrey Facility.

89.     Defendants also misled investors with respect to the Company's supposed efforts to "de[-]risk" its pin production, which was in fact located entirely at the Monterrey Facility, by telling them that the Company was implementing pin production operations at its St. Marys facility. Specifically, during its second quarter 2021 earnings call on August 6, 2021, Defendant

Halford told investors that the Company was "investing in a pin production line at [its] St. Marys, Pennsylvania facility that will be online in the third quarter." Defendant Halford represented that this action "diversifie[d] [GrafTech's] pin capability and provide[d] production flexibility."

90. According to a former Company Manufacturing Engineering Lead (the "Former Engineering Lead") hired by GrafTech in August 2022 to work on the team responsible for restarting the St. Marys Facility, the St. Marys Facility produced no pins or pin stock whatsoever during 2021 or 2022 and lacked even the proper "operating permits" to perform such activity. Further, cooling pond lacked water and the tools for the press were rusted and covered in dust, making it clear to the Former Engineering Lead that no pin production or manufacturing had taken place within the last year.

91. According to the Former Engineering Lead, Defendant Halford, who was ultimately responsible for restarting the facility, regularly visited the St. Marys Facility, and was thus well aware no production was occurring there.

92. The St. Marys Facility would not conduct its first "pin trial run" until late 2023 and, according to the Former Engineering Lead, would fail to get any pin production operation running before his tenure with the Company ended in April 2024.

93. On August 11, 2022, Garza addressed the Apodaca City Council, stating in relevant part that "[GrafTech] has always had the ability, the skill, to be able to evade the inspection actions that various authorities have attempted to carry out over time. I have witnessed how various attempts have been made over time, none of which have been successfully completed." Mayor Garza continued, stating that "[a]greements were signed, follow-ups were carried out, investments were made, but we have no results. The children in this part of the city are condemned to be taught to crawl on their hands and knees and their little black feet." Garza further added:

We have access to a report from the Ministry of the Environment, in which *monitoring shows that the emission of carbon particles increases during the night*. That is to say, it allows us to presume *a fraud on the part of the company that knows that the black cloud of coal that they discard at night is less perceptible to citizens who wake up with the dust scattered on their properties, on the porches of their houses, on the cars from our city.*

94.     On September 16, 2022, just over a month later, the Company filed a Form 8-K with the SEC (the "September 2022 8-K") that disclosed that the Monterrey Facility had received a temporary suspension notice following a September 15, 2022 inspection of the "facility and certain of the facility's environmental and operating permits" by the State Attorney's office for the Secretary of Environment and the Ministry of the Environment of the State of Nuevo León, Mexico. The September 2022 8-K further disclosed that GrafTech Mexico's operating license was "no longer in effect."

### The Individual Defendants' Materially False and Misleading Statements

95.     Throughout the Relevant Period, the Individual Defendants made materially false and misleading statements to the investing public, including statements concerning the Company's compliance with environmental laws and regulations, the Monterrey Facility, and the St. Marys Facility.

96.     On February 8, 2019, the Company issued a press release disclosing its financial results for the fourth quarter and year ended December 31, 2018, and held its corresponding earnings call with investors. During this earnings call, Defendant Rintoul boasted about the purported competitive advantages of the Company while concealing their origin, which in substantial part derived from the Company's failure to implement necessary environmental safeguards at the Monterrey Facility. Specifically, Defendant Rintoul credited "[o]ngoing operational improvements and vertical integration" for giving "GrafTech economies of scale and a competitive cost structure."

97.     During the call, Defendant Rintoul continued to emphasize the St. Marys Facility's ability to "support the overall flexibility of [GrafTech's] manufacturing footprint," stating that GrafTech would "ramp up production at St. Marys if required by the market at any point in the future." He further stated at this time that "St. Marys can be thought of as essentially the equivalent of a peaking plant," and that the Company intended to operate it in that fashion.

98.     During a question-and-answer portion of the call, Defendant Rintoul further stated that the Company expected "the degree to which [the Company] run that will move up and down based upon the market dynamics, not unlike that of, again, in the analogy of a peaking plant."

99.     On February 22, 2019, the company filed a Form 10-K with the SEC for the year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Rintoul, Coburn, and Dumas. Appended to the 2018 10-K as an exhibit were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Rintoul and Coburn certifying that the 2018 10-K "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [2018 10-K] fairly presents, in all material respects, the financial condition and results of the company.

100.    The 2018 10-K represented that the Company was in compliance with all applicable environmental laws and regulations in its manufacturing process, stating that the Company believed itself to be "currently in compliance in all material respects with the federal, state, local, and foreign environmental laws and regulations to which [the Company is] subject."

101.    Similarly, the 2018 10-K stated that the Company managed its "capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors. The 2018 10-K elaborated on this last point, stating that the

Company had an "on-going commitment to rigorous internal environmental protection standards," and that accordingly "[e]nvironmental considerations [we]re part of all significant capital expenditure decisions."

102.    With respect to "Competitive strengths," the 2018 10-K highlighted GrafTech's "lowest cost large-scale" manufacturing plants, including the Monterrey Facility, stating in relevant part:

> We believe our facilities are among the most strategically located and lowest cost large-scale graphite electrode manufacturing plants in the world. Of the graphite electrode manufacturing facilities currently operating outside of China, we estimate that our three operating manufacturing facilities represent approximately 24% of estimated production capacity for graphite electrodes, making us a critical supplier to global EAF steel manufacturers. Our manufacturing facilities are located in the Americas and EMEA, providing us with access to low-cost and reliable energy sources, logistical and freight advantages in sourcing raw materials and shipping our graphite electrodes to our customers compared to our competitors, and excellent visibility into the large North American and European EAF steelmaking markets.

103.    With respect to the Monterrey Facility's specific "cost advantages," the 2018 10-K stated in relevant part that:

> Our manufacturing facilities significantly benefit from their size and scale, work force flexibility, access to attractively-priced sources of power and other key raw materials, and our substantial vertical integration with Seadrift. By operating three of the five highest capacity graphite electrode production facilities in the world, we are able to achieve meaningful operating leverage relative to our competitors. Because of the attractive cost of labor available to our Monterrey facility, we believe we have a significant cost advantage in the production of pins, which are used to connect and fasten graphite electrodes together in a furnace and are more labor-intensive to produce than other graphite electrodes. Our Calais, Pamplona and Monterrey facilities have access to low-cost sources of electricity, a significant element of our manufacturing costs.
>
> * * *
>
> Moreover, our Seadrift, Calais, Pamplona, Monterrey and St. Marys facilities each provide unique advantages for us.... We believe our facilities have significant cost advantages given their scale and access to low cost, reliable energy sources.

104.     On May 1, 2019, the Company filed a Form 10-Q with the SEC for the quarter ended March 31, 2019 (the "Q1 2019 10-Q"), which was signed by Defendant Coburn. Appended to the Q1 2019 10-Q as an exhibit were SOX certifications signed by Defendants Rintoul and Coburn certifying that the Q1 2019 10-Q "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [Q1 2019 10-Q] fairly presents, in all material respects, the financial condition and results of the company.

105.     The Q1 2019 10-Q disclosed that on March 1, 2019, the Department of Sustainable Development "provided notice of an administrative proceeding with respect of the company's Monterrey Facility," which required the Company to "design and implement certain corrective measures involving certain potential violations of state environmental law relating to emissions." The Q1 2019 10-Q represented that the Company was "cooperating" with regulators in connection with the administrative proceeding and reasserted the Defendants' claim that the Company managed its "capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.

106.     On July 31, 2019, the Company filed a Form 10-Q for the quarter ended June 30, 2019 (the "Q2 2019 10-Q"), which was signed by Defendant Coburn. Appended to the Q2 2019 10-Q as an exhibit were SOX certifications signed by certifying that the Q2 2019 10-Q "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [Q2 2019 10-Q] fairly presents, in all material respects, the financial condition and results of the company.

107.     The Q2 2019 10-Q substantially repeated the misrepresentations contained in the Q1 2019 10-Q as described above, including its characterization of the status of its ameliorative action at the Monterrey Facility as working to correct "potential violations of state environmental

Case: 1:25-cv-01248-DCN  Doc #: 1  Filed:  06/13/25  37 of 75.  PageID #: 37

laws relating to emissions[,]" and repeated the Q1 2019 10-Q's representation that the Company was "cooperating with the Department" with respect to the administrative proceeding.

108.     The Q1 2019 10-Q also recapitulated Defendants' claim that the Company managed "[its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements, among other factors."

109.     On November 7, 2019, the Company filed a Form 10-Q for the quarter ended September 30, 2019 (the "Q3 2019 10-Q"), which was signed by Defendant Coburn. Appended to the Q3 2019 10-Q as an exhibit were SOX certifications signed by Defendants Coburn and Rintoul certifying that the Q3 2019 10-Q "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [Q3 2019 10-Q] fairly presents, in all material respects, the financial condition and results of the company.

110.     The Q3 2019 10-Q reiterated that the Department of Sustainable Development had issued a notice of administrative proceeding regarding the Monterrey Facility, requiring the Company to "design and implement certain corrective measures involving certain potential violations of state environmental law relating to emissions." The Q3 2019 10-Q further represented that GrafTech had "cooperated with the Department" with respect thereto, "including payment of certain fines that were not material to the Company." The November 10-Q also reported that, in September 2019, "the Department of Sustainable Development formally closed the proceeding."

111.     Also on November 7, 2019, the Company held an earnings call to discuss the Company's third quarter 2019 results. During this call, Defendant Coburn stated that the Company would "continue to invest in health, safety and environmental performance."

112.     On February 21, 2020, GrafTech filed on Form 10-K with the SEC its annual report for the year ended December 31, 2019 (the "2019 10-K"), which was signed by Defendants

37

Rintoul, Coburn, Dumas, and Taccone. Therein, the Company represented that it believed itself "currently in compliance in all material respects with the federal, state, local and foreign environmental laws and regulations to which [the Company is] subject." Appended to the 2019 10-K as an exhibit were SOX certifications signed by Defendants Coburn and Rintoul certifying that the 2019 10-K "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [2019 10-K] fairly presents, in all material respects, the financial condition and results of the company.

113.    The 2019 10-K also repeated previous claims that the Company managed its "capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors. Finally, the 2019 10-K also represented that the Company had an "on-going commitment to rigorous internal environmental protection standards" and that "[e]nvironmental considerations [we]re part of all significant capital expenditure decisions."

114.    With respect to "Competitive strengths," the 2019 10-K emphasized the Company's purported "lowest cost large-scale" manufacturing plants, stating in pertinent part that:

> We believe our facilities are among the most strategically located and lowest cost large-scale graphite electrode manufacturing plants in the world. Of the graphite electrode manufacturing facilities currently operating, we estimate that our three primary operating manufacturing facilities represent approximately 24% of estimated production capacity for graphite electrodes outside of China, making us a critical supplier to global EAF steel manufacturers. Our manufacturing facilities are located in the Americas and EMEA, providing us with access to low-cost and reliable energy sources, logistical and freight advantages in sourcing raw materials and shipping our graphite electrodes to our customers compared to our competitors, and excellent visibility into the large North American and European EAF steelmaking markets. . . . .
>
> * * *
>
> We believe our business has the lowest manufacturing cost structure of all of our major competitors, primarily due to the large scale of our manufacturing facilities.

115.    The 2019 10-K also highlighted the specific "cost advantages" the Monterrey Facility provided the Company, stating in relevant part:

> [O]ur Calais, Pamplona, Monterrey and St. Marys facilities each provide unique cost advantages given their scale and access to low cost, reliable energy sources.
>
> * * *
>
> Our manufacturing facilities significantly benefit from their size and scale, work force flexibility, access to attractively-priced sources of power and other key raw materials, and our substantial vertical integration with Seadrift. Our Calais, Pamplona, Monterrey and St. Marys facilities have access to low-cost sources of electricity with essential logistical infrastructure in place, which is a significant element of our manufacturing costs.

116.    On September 16, 2020, GrafTech published its inaugural sustainability report (the "2019 Sustainability Report"). It opened with a message from Defendant Rintoul, who described the report as intended to provide stakeholders with a "better understanding of our sharp focus on and plans for continued improvement of [the Company'] ESG programs." The 2019 Sustainability Report similarly stated that its publication constituted an "important step towards demonstrating our commitment to transparency regarding environmental, social, and governance topics."

117.    The 2019 Sustainability Report further stated that:

> As a manufacturer of graphite electrodes, we are cognizant of our impacts on the environment. From energy consumption and air emissions to water use and waste handling, we proactively take steps to reduce these impacts throughout our operations.

118.    The 2019 Sustainability Report also represented that the Company was proactively working to reduce air emissions and dust around its plants, including at the Monterrey Facility. In relevant part, the 2019 Sustainability Report stated that:

> To reduce emissions, we have installed control technology on our equipment, which limits the amount of air emissions that enter the environment. In coordination with our sites, our HS&EP and Technology Teams look for and evaluate new and innovative ways to reduce our missions. Reducing air emissions may come from a variety of activities, including changes and upgrades in processes; upgrading and adding control equipment (dust collectors and SO2 abatement systems); and

39

increased preventative maintenance programs. GrafTech has also focused on improving the housekeeping around our plants to further reduce dirt and dust. In Monterrey, a new dust collector was installed for our bake process and a new material transport system was installed for moving raw materials from storage to the processing area.

119. The 2019 Sustainability Report further highlighted the Company's ostensible attempts to "foster relationships" with the relevant Monterrey governmental authorities:

Over the last year, we have worked hard to develop and foster relationships with the government and community representatives. Whether it is upgrading the perimeter of our property, planting trees, sharing our sports complex with the community, or holding open houses to educate people about our business, GrafTech is looking for ways to become a better neighbor.

120. On November 3, 2020, the Company issued a press release disclosing its financial results for the quarter ended September 30, 2020 (the "November 2020 Press Release"), which was also filed with the SEC as an exhibit to a Form 8-K signed by Defendant Coburn. Among other things, November 2020 Press Release stated that Company's allegedly "advantaged low cost structure" was a "sustainable competitive advantage[]."

121. Also on November 3, 2020, the Company held an earnings call, during which Defendant Rintoul claimed the Company was focused "on being good environmental stewards," was "fully committed" to the efforts described in the 2019 Sustainability Report, and was continuing to "monitor progress on our environmental initiatives." Defendant Rintoul also stated that the Company was "well positioned" because of its "low-cost structure," which he proclaimed a "sustainable and long-term competitive advantage."

122. Also on November 3, 2020, the Company filed on Form 10-Q with the SEC a quarterly report for the quarter ended September 30, 2020 (the "November 2020 10-Q"), which was signed by Defendant Coburn. Appended to the Q3 2020 10-Q as an exhibit were SOX certifications signed by Defendants Coburn and Rintoul certifying that the Q3 2020 10-Q "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that

"[t]he information contained in the [Q3 2020 10-Q] fairly presents, in all material respects, the financial condition and results of the company.

123.    The November 2020 10-Q contained statements substantially identical to those in the November 2020 Press Release. The November 2020 10-Q also repeated prior claims by the Company that it managed its "capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.

124.    On November 10, 2020, the Company filed with the SEC a Prospectus Supplement on Form 424B7 (the "November 2020 Prospectus"). Therein, the Company boasted about its purported "low-cost" manufacturing facilities, in relevant part stating that:

> We believe that we have the most competitive portfolio of low-cost graphite electrode manufacturing facilities in the industry, including three of the highest capacity facilities in the world. We are the only large scale graphite electrode producer that is substantially vertically integrated into petroleum needle coke, a key raw material for graphite electrode manufacturing. This unique position provides us with competitive advantages in product quality and cost.

125.    On December 16, 2020, the Company field with the SEC a Prospectus Supplement on Form 424B7 (the "December 2020 Prospectus"). The December 2020 Prospectus contained statements substantially identical to those in the November 2020 Prospectus.

126.    Statements substantially similar to those detailed in the November 2020 Prospectus and December 2020 Prospectus were included in prospectus supplements the Company filed on Form 424B7 on January 19, 2021, March 3, 2021, and May 26, 2021.

127.    On February 5, 2021, the Company issued a press release disclosing its financial results for 2020's fourth quarter and the year ended December 31, 2020, which was also filed with the SEC on February 5, 2021, as an exhibit to a Form 8-K (the "February 2021 Press Release"), which was signed by Defendant Coburn. The February 2021 Press Release quoted Defendant

Rintoul as stating that GrafTech's "advantaged low-cost structure" was a "sustainable" competitive advantage.

128.     During an earnings call that same day, in addition to again referring to the Company's "advantaged lowest-cost structure" as a "sustainable and long-term competitive advantage," Defendant Rintoul stated that the Company was "centered on improving [its] environmental footprint," continuing:

> Quinn [Coburn] and I and our senior executives participate in our ESG steering committee. The steering committee oversees our sustainability strategy, which compromises – or comprises rather, of employee health and safety, community relations, materials sourcing and efficiency, energy management, greenhouse gas emissions, air quality, water and wastewater management and waste management. The strategy encompasses activities as varied as our community involvement and outreach in Monterrey, Mexico, our capture of energy generated at our Seadrift Coke facility to create additional sources of electricity for the area and our emission reduction efforts that include the installation of control technology on equipment on all of our sites. Our goals are centered on improving our environmental footprint across our operations. We are working hard to be good corporate citizens in the communities where we operate. And every day, our business decisions and actions are guided by our code of conduct and ethics. We look forward to continuing our ESG dialogue with you and publishing our second annual sustainability report later this year.

129.     On on February 23, 2021, the Company filed on Form 10-K with the SEC its annual report for the year ended December 31, 2020 (the "2020 10-K"), which was signed by Defendants, Coburn, Dumas, and Taccone. Appended to the 2020 10-K as exhibits were SOX certifications signed by Defendants Coburn and Rintoul certifying that the 2020 10-K "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of the company.

130.     The 2020 10-K represented that the Company believed itself "currently in compliance in all material respects with the federal, state, local and foreign environmental laws and regulations to which [GrafTech is] subject."

131.     The the 2020 10-K claimed the Company managed its capital expenditures by accounting for "quality, plant reliability, safety, environmental and regulatory requirements," and other factors. The 2020 10-K also touted the Company's "on-going commitment to rigorous internal environmental protection standards," and that "[e]nvironmental considerations are part of all significant capital expenditure decisions."

132.     With respect to "Competitive strengths," the 2020 10-K stated:

We believe our facilities are among the most strategically located and lowest cost, large-scale graphite electrode manufacturing plants in the world. Of the graphite electrode manufacturing facilities currently operating, we estimate that our three primary operating manufacturing facilities represent approximately a quarter of estimated production capacity for graphite electrodes outside of China, making us a critical supplier to global EAF steel manufacturers. Our manufacturing facilities are located in the Americas and EMEA, providing us with access to low-cost and reliable energy sources, logistical and freight advantages in sourcing raw materials and shipping our graphite electrodes to our customers compared to our competitors, and excellent visibility into the large North American and European EAF steelmaking markets.

133.     The 2020 10-K also continued to boast of the "cost advantages" GrafTech enjoyed from the Monterrey Facility, stating in relevant part that:

[O]ur Calais, Pamplona, Monterrey and St. Marys facilities each provides unique cost advantages given its scale and access to low cost, reliable energy sources.

* * *

Our manufacturing facilities significantly benefit from their size and scale, work force flexibility, access to attractively-priced sources of power and other key raw materials, and our substantial vertical integration with Seadrift. Our Calais, Pamplona, Monterrey and St Marys facilities have access to low-cost sources of electricity with essential logistical infrastructure in place, which is a significant element of our manufacturing costs.

134.     On May 5, 2021, the Company filed with the SEC a quarterly report for the quarter ended March 31, 2021 on Form 10-Q (the "Q1 2021 10-Q"), which was signed by Defendant Coburn. The Q1 2021 10-Q described the Company's "low cost structure" as a "sustainable" competitive advantage, and further represented that the Company managed its "capital

expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors. Appended to the Q1 2021 10-Q as an exhibit were SOX certifications signed by Defendants Coburn and Rintoul certifying that the Q1 2021 10-Q "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [Q1 2021 10-Q] fairly presents, in all material respects, the financial condition and results of the company.

135.    Also on May 5, 2021, the Company held an earnings call, in connection with which it released a presentation that it referenced throughout said call. The presentation claimed that the Company was being "proactive to improve [its] environmental footprint," including via equipment upgrades. The presentation also included the following graphic:



136.    During an earning call held the same day, Defendant Rintoul claimed this graphic represented the Company's "constant focus" on "safety, environment, [and] quality," and that "SEQ" was a "core mission" of the Company. Defendant Rintoul continued by again highlighting the Company's supposed "low-cost structure" as a "sustainable and long-term competitive advantage."

137.    In prepared remarks during this earnings call, Defendant Halford echoed Defendant Rintoul's claims regarding the Company's supposed focus on environmentalism, stating in relevant part:

> Our ESG efforts fit seamlessly with our focus on safety, environment and quality, as Dave described. Our ESG Steering Committee, comprised of several members of our executive team, including me, Dave and Quinn, oversees our sustainability strategy.

138. On August 6, 2021, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2021 ("Q2 2021 10-Q"), which was signed by Defendant Coburn. The Q2 2021 10-Q touted the Company's "low cost structure" as a "sustainable" competitive advantage. Additionally, the Q2 2021 10-Q stated that GrafTech "manage[d] [its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors. Appended to the Q2 2021 10-Q as exhibits were SOX certifications signed by Defendants Coburn and Rintoul certifying that the Q2 2021 10-Q "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [Q2 2021 10-Q] fairly presents, in all material respects, the financial condition and results of the company.

139. Also on August 6, 2021, the Company held an earnings call, during which Defendant Halford stated in relevant part:

> We continue to make good progress with our ESG efforts along several pads. Notably, in the second quarter, we completed a full materiality assessment with the assistance of external experts to identify and prioritize the key ESG issues for our business and our stakeholders. The process allowed us to objectively determine the ESG topics that will drive our sustainability strategy, reporting and actions moving forward.

140. A presentation used during this earnings call claimed the Company was using "[s]ustainability goal setting to drive performance" on the Company's ESG initiatives, highlighting recent actions the Company had taken at the Monterrey Facility, as shown in the following slide:



141.    During the same call, Defendant Rintoul again highlighted the Company's purported "low-cost structure," which he characterized as a "sustainable and long-term competitive advantage." Defendant Halford stated that the Company was "investing in a pin production line at [the Company's] St. Marys, Pennsylvania facility that will be online in the third quarter." Defendant Halford elaborated: "[t]his diversifies our pin capacity and provides production flexibility."

142.    On September 23, 2021, the Company published its 2020 Sustainability Report (the "2020 Sustainability Report"). The 2020 Sustainability Report included a "message" from Defendant Rintoul, claiming the Company was "committed" to improving its environmental footprint and emphasizing the progress the Company was purportedly making at its Monterrey facility, stating in relevant part:

> As you will read about further in this report, we are committed to improving our environmental footprint. We continue to monitor and track our progress on energy consumption and air emissions to identify opportunities for improvements. During 2020, at our Monterrey, Mexico facility, we continued to implement projects focused on controlling emissions, such as installation of new dust collection systems and upgrades to our mill, mix and forming, and baking operations to enhance our air emission controls.

143.     Under the heading "Environment," the 2020 Sustainability Report claimed the Company had undertaken "extensive work" to better understand its environmental footprint and claimed that it was "committed to the protection of our communities and environment." It further stated that the Company "believes in a strong environmental management system, which is anchored by policies and procedures that allow us to operate in compliance with our regulatory obligations, identify risks, and understand and reduce our environmental impacts."

144.     The 2020 Sustainability Report also featured the Monterrey Facility in a "Spotlight," stating in relevant part:

> At GrafTech, our employees are actively engaged in efforts to improve HS&EP. It is not only acknowledged and communicated as a priority, but it is clear in our operations when you visit our sites. Our employees in Monterrey, Mexico, are involved in how we translate our health, safety, and environmental commitment into practice.
>
> Our Monterrey team continued their work on housekeeping, improving environmental controls and facility upgrades. For example, during 2020, we completed construction of a new raw material handling system and improved management of our dust collection systems.

145.     The 2020 Sustainability Report additionally highlighted the Company's various initiatives across its operations, and specifically at the Monterrey Facility, to improve emissions and air quality. In relevant part, it stated:

> We have undertaken an initiative to improve critical assets, such as our bake and graphitizing furnaces and emission control equipment, with digital controls and predictive alerts, to help identify potential issues and mitigate process interruptions. These enhancements are expected to result in improved process efficiency and reliability in our operations.
>
> In Monterrey, we recently invested in automated controls, which maintain temperatures in the bake furnace thermal oxidizers, resulting in more thorough reduction of air emissions from these operations. We modified our bake ovens to allow for increased air circulation to reduce accumulation of particulate matter in the ovens. Our team in charge of this project meets on a regular basis to report on progress.

146.    On November 5, 2021, the Company filed a Form 10-Q with the SEC to report its earnings for the quarter ended September 30, 2021 (the "Q3 2021 10-Q"). The Q3 2021 10-Q was signed by Defendant Coburn and touted GrafTech's "low cost structure" as a purported "sustainable" competitive advantage. Additionally, the Q3 2021 10-Q stated that GrafTech "manage[d] [its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors. Furthermore, the Q3 2021 10-Q stated that "[i]n the third quarter of 2021, [the Company] introduced additional connecting pin production capabilities at our St. Marys, Pennsylvania facility."

147.    Also on November 5, 2021, the Company held an earnings call during which Defendant Rintoul again described the Company's "low-cost structure," as a "sustainable and long-term competitive advantage." During this earnings call, Defendant Halford told investors that the "pin production line at our St. Marys, Pennsylvania facility is now operational, and we are ramping up production" and that this would provide the Company "with 2 connecting pin production facilities."

148.    On February 4, 2022, GrafTech issued a press release disclosing the Company's financial results for the fourth quarter and year ended December 31, 2021, which was also filed with the SEC as an exhibit attached to a Form 8-K signed by Defendant Flanagan (the "February 2022 Press Release"). The February 2022 Press Release quoted Defendant Rintoul regarding the purported "progress" GrafTech had made in its efforts "minimize [GrafTech's] environmental footprint," stating in relevant part:

> We continued to make progress with our ESG efforts including a number of projects throughout our manufacturing plants in an effort to minimize our environmental footprint.

149.    On February 4, 2022, the Company held an earnings call during which Defendant Rintoul again highlighted the Company's "low-cost structure" and described it as a "sustainable

and long-term competitive advantage." Defendant Halford, meanwhile, emphasized GrafTech's "enhanced reporting" with respect to its sustainability initiatives, and represented that GrafTech had completed "several projects," including improvements at all of its manufacturing plants "to improve air emissions," stating in relevant part as follows:

> We continue to progress on our ESG journey. In September, we published our second annual sustainability report, which is available on our website. Our enhanced reporting in this area will not only benefit our stakeholders but will also assist us in identifying projects that will improve our environmental impact.
>
> We've already completed several projects in this area. For example, in 2021, every electrode manufacturing plant completed at least one capital project to improve air emissions. We plan to keep up our momentum in this area and have already identified additional projects for 2022 that will further advance our environmental efforts.

150.    Defendant Halford also told investors: "Our investment in the new automated pin line at St. Marys continues to progress well and helps to de[-]risk our pin production capacity."

151.    On February 22, 2022, GrafTech filed with the SEC its annual report on Form 10-K for the year ended December 31, 2021 ("2021 10-K"), which was signed by Defendants Rintoul, Flanagan, Keizer, Dumas, Fine, German, and Taccone. The 2021 10-K stated that GrafTech "manage[d] [its] capital expenditures by taking believe[d] [the Company] operate[d] in compliance in all material respects with applicable laws and regulations into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.

152.    The 2021 10-K also represented that the Company had an "on-going commitment to rigorous internal environmental protection standards," and that "[e]nvironmental considerations [were] part of all significant capital expenditure decisions." Under a heading titled "Competitive strengths," the 2021 10-K, stated, in relevant part, that:

> We believe our facilities are among the most strategically located and lowest cost, large-scale graphite electrode manufacturing plants in the world. Of the graphite electrode manufacturing facilities currently operating, we estimate that our three primary operating manufacturing facilities represent approximately a quarter of

estimated production capacity for graphite electrodes outside of China, making us a critical supplier to global EAF steel manufacturers. Our manufacturing facilities are located in the Americas and EMEA, providing us with access to low-cost and reliable energy sources, logistical and freight advantages in sourcing raw materials and shipping our graphite electrodes to our customers compared to our competitors, and excellent visibility into the large North American and European EAF steelmaking markets.

153.    The 2021 10-K also boasted the Company's "cost advantages" derived from the Monterrey Facility, stating in relevant part that:

> [O]ur Calais, Pamplona, Monterrey and St. Marys facilities each provides unique cost advantages given its scale and access to reliable energy sources.
>
> * * *
>
> Our manufacturing facilities significantly benefit from their size and scale, work force flexibility, access to attractively-priced sources of power and other key raw materials, and our substantial vertical integration with Seadrift. Our Calais, Pamplona, Monterrey and St Marys facilities have access to reliable sources of electricity with essential logistical infrastructure in place, which is a significant element of our manufacturing costs.

154.    On May 6, 2022, GrafTech issued a press release disclosing the Company's financial results for the quarter ended March 31, 2022, which it filed with the SEC as an exhibit attached to a Form 8-K signed by Defendant Flanagan (the "May 2022 Press Release"). The May 2022 Press Release quoted Defendant Rintoul regarding GrafTech's purported commitment to improving its environmental impacts, stating in relevant part:

> We are proud of the continued progress we are making with our sustainability efforts across the organization. These include capital projects to improve our environmental footprint and the establishment of key environmental goals, which includes targeting a meaningful reduction in greenhouse gas emissions.

155.    Also on May 6, 2022, GrafTech held an earnings call with analysts to discuss the Company's financial and operational results for the quarter. During the call, in addition to Defendant Rintoul again emphasizing the Company's "low-cost structure" as a "sustainable and

long-term competitive advantage," defendant Halford again highlighted GrafTech's purported focus on improving its "environmental impact," stating:

> [W]e also continue to make good progress on our own key sustainability initiatives. Most recently, we've established environmental goals, which will be highlighted in our next annual sustainability report. These include a commitment for a meaningful reduction in greenhouse gas emissions. To support this objective, we continue to invest in capital projects that will further improve our environmental impact.

156.    Also during the call, Defendant Halford also told investors that the Company's "recent investment in the automated pin line at St. Marys continues to progress and helps to de[-]risk our pin production capacity."

157.    Also on May 6, 2022, the Company filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2022 (the "Q1 2022 10-Q"), which was signed by Defendant Rintoul and Defendant Flanagan. The Q1 2022 10-Q once again touted the Company's "low cost structure," as a "sustainable" competitive advantage. In addition, the Q1 2022 10-Q stated that GrafTech "manage[d] [its] capital expenditures by taking into account quality, plant reliability, safety, environmental and regulatory requirements," among other factors.

158.    The statements detailed above were materially false and misleading when made, and omitted facts necessary to make the statements not misleading. Specifically, that: (1) the advantages of the Company's purportedly low cost structure were in large part due to GrafTech's blatant disregard of applicable environmental laws and regulations at the Monterrey Facility; (2) despite claiming that the Company was actively pursuing an environmentally conscious agenda set on legal compliance, it was actively engaging in such blatant disregard of applicable environmental laws and regulations; (3) the St. Marys Facility was not producing or capable of producing pin stock, and would require a minimum of 18-24 months to ramp up production thereof; (4) because the St. Marys Facility could not produce pin stock, the Monterrey Facility was the company's sole source of pin stock for all of its operations; and (5) the closure of the Monterrey

Facility, the Company's sole producer of pin stock, resulted in significant, long-lasting negative consequences for the Company's business operations and performance entering 2023. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***The Truth Begins to Emerge, as False and Misleading Statements Continue***

159.    The truth began to emerge on September 16, 2022, when the Company filed a Form 8-K signed by Defendant Flanagan (the "September 2022 Press Release"), disclosing that the Monterrey Facility had received a "temporary suspension notice" ordering the facility to "wind down operations within seven days," following the conclusion of a September 15, 2022 inspection of the "facility and certain of the facility's environmental and operating permits" by the State Attorney's office for the Secretary of Environment and the Ministry of the Environment of the State of Nuevo León, Mexico. The September 2022 Press Release further disclosed that "[i]n parallel, the Director of Integral Air Management of the Undersecretary of Climate Change and Air Quality of the Ministry of the Environment determined that, among other things, GrafTech Mexico's operating license was no longer in effect." The September 2022 Press Release provided no further details regarding the cause of the temporary suspension notice or the potential financial impacts of the Monterrey Facility's closure.

160.    In reality, however: (1) the St. Marys Facility was not producing or capable of producing pin stock, and would require a minimum of 18-24 months to ramp up production thereof; (2) because the St. Marys Facility could not produce pin stock, the Monterrey Facility was the company's sole source of pin stock for all of its operations; and (3) the closure of the Monterrey Facility, the Company's sole producer of pin stock, resulted in significant, long-lasting negative consequences for the Company's business operations and performance entering 2023.

161.   On November 4, 2022, GrafTech filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2022 ("Q3 2022 10-Q"), which was signed by Defendant Kessler and Defendant Flanagan. Appended to the Q3 2022 10-Q as an exhibit were SOX certifications signed by Defendants Flanagan and Kessler certifying that the Q3 2022 10-Q "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [Q3 2022 10-Q] fairly presents, in all material respects, the financial condition and results of the company.

162.   The Q3 2022 10-Q revealed that the St. Marys Facility's reportedly operational pin production line had not "de[-]risk[ed]" the Company's "pin production capacity" and was not capable of replacing the Monterrey Facility's manufacturing capacity in the near term. Rather, the Q3 2022 10-Q disclosed that the Monterrey facility was "currently [the Company's] only site that produces the pin stock utilized for all [of the Company's graphite] electrodes." The Q3 2022 10-Q continued, in relevant part:

> [W]e are pursuing several alternatives with respect to production and sourcing of pin stock as well as other mitigation activities to minimize the impact on our business and our customers if the Monterrey suspension continues for the foreseeable future. These include a potential restart of our St. Marys, Pennsylvania facility, where the scope of production is currently limited to graphitizing and machining of electrodes and pins. We are actively pursuing approvals for operating permits for a restart of the facility for pin production.

163.   The Q3 2022 Form 10-Q represented that the financial impact of the closure would only significantly impact the Company's financial results beyond the fourth quarter of 2022 if the Monterrey facility remained suspended, stating in pertinent part:

> Beyond the fourth quarter of 2022, if Monterrey remains suspended, the impact on the Company's results in the first half of 2023 will be significant, with sales volume reduced by 50% or more, compared to sales volume in the first half of 2022, before recovering in the back half of the year.

164.   Also on November 4, 2022, the Company held an earnings call during which

Defendant Kessler reiterated that the Company's business performance would only be significantly impacted by the Monterrey Facility's shutdown if it remained closed – and that, under those circumstances, the impact would be limited to the first half of 2023. Defendant Kessler specifically stated that "unless Monterrey reopens, our business performance will be significantly impacted for the first 2 quarters of 2023 with a reduction in sales volume of 50% or more before recovering in the back half of the year." In response to analyst questions, Defendant Kessler provided assurance that "the impact for Q4 will be modest because we do have quite a bit of existing pin inventory."

165.    During a question-and-answer portion of the call, Defendant Halford confirmed Defendant Kessler's assessment of the Company's pin stock inventory:

> The substantial majority of the pins that are required to achieve what we're talking about are already in inventory in one form or another. So this is not something that we are going to be dependent on third parties or some other source for achieving the level of achievement that Marcel talked about. We have a substantial amount of inventory. We have kept a substantial amount of inventory all the way along of pins and pin stock, and we will be processing that through the other facilities in order to achieve what Marcel was talking about.

166.    Further, Defendant Halford also engaged with RBC analyst Arun Viswanathan regarding the Monterrey Facility's closure and its impact on contract negotiation for the country:

> [*Analyst*:] Okay. And then maybe you could just help us understand or get your perspective on contracting. Unfortunately, the Monterrey facility is not running full out. So your volumes are going to be down in the first half. And so maybe that limits the kind of commercial opportunities that you can put forward to your customers, is that true? And are you kind of now operating more at a kind of shorter time frame, maybe 1 to 3 months of visibility? Or how are you thinking about setting up the next couple of periods of the order book? Is there other options for you in front of you?

> [*Halford*:] Yes, thanks. It's an important question, Arun. And one of the things that I want to make clear is that while we need to consider the near-term supply constraints related to the Monterrey situation, none of this changes our commercial strategy. We continue to believe that we are unique in the market in our ability to offer a variety of different contracting terms to our customers, that's supported by our vertical integration, and that's a key differentiator, our ability to provide that certainty to our customers. And while in the very near term, we're dealing with the Monterrey situation, we have absolute confidence in our ability to resolve this

current environment we're in, and it's not changing our commercial strategy at all.

167.    On this news, the price of the Company's common stock declined by $0.24 per share, approximately 5%, from a closing price of $4.85 per share on November 3, 2022, to close at $4.61 per share on November 4, 2022.

168.    The statements detailed above were materially false and misleading when made because they concealed material information known to Defendants regarding the impact of the Monterrey Facility's closure upon the Company's business and financial prospects. Said statements, inter alia: (1) misled the public regarding the fact that the St. Marys Facility was not producing or capable of producing pin stock, and would require a minimum of 18-24 months to ramp up production thereof; (2) that because the St. Marys Facility could not produce pin stock, the Monterrey Facility was the company's sole source of pin stock for all of its operations; and (3) the closure of the Monterrey Facility, the Company's sole producer of pin stock, resulted in significant, long-lasting negative consequences for the Company's business operations and performance entering 2023.

169.    On November 18, 2022, the Company issued a press release which it also filed with the SEC as an exhibit to a Form 8-K signed by Defendant Flanagan (the "November 2022 Press Release"). The November 2022 8-K announced that the Company's Monterrey facility was permitted to immediately resume operations pending the Company's "completion of certain agreed upon activities," including the submission of an environmental impact study regarding the Monterrey Facility's operations. The November 2022 Press Release further stated that, for the fourth quarter of 2022, the impact of the Monterrey facility's temporary closure on customer orders would be "consistent with its previous outlook provided on November 4, 2022," but declined to provide any update regarding the estimated impact of the closure with regard to GrafTech's 2023 outlook.

170.     On February 3, 2023, the Company issued a press release disclosing the Company's financial and operational results for the fourth quarter and full year ended December 31, 2022. This press release was also filed with the SEC as an exhibit attached to a Form 8-K signed by Defendant Flanagan (the "February 2023 Press Release"). These disclosures revealed that, despite the Monterrey facility reopening within two weeks of the Company's November 4, 2022 earnings call, the temporary closure had had a significant impact on the Company's fourth quarter performance and was expected to have a significant impact upon the Company's sales volume in the first half of 2023.

171.     During an earnings call held the same day, Defendant Kessler elaborated on the extended impact from the Monterrey Facility's closure:

> While we are encouraged to be working towards final resolution of the situation, the negative impact of the suspension on our operating performance in the first half of 2023 will be significant. Although production of electrodes and pin stock began immediately upon the [lifting] of the suspension, the required manufacturing time for our products is generally several months. As such, the rebuilding of our pin stock inventory will take time.

> In addition, on the commercial front, the timing of the suspension coincides with the critical time frame to secure customer orders for the first half of 2023. As a result of the uncertainty caused by the suspension during this contract negotiation window, our ability to enter into new customer commitments for the first half of 2023 was limited. As a result, we estimate our sales volume for the first 6 months of this year will be approximately half of the level we reported in 2022 with the largest negative impact materializing in the first quarter of this year.

172.     Further, Defendant Kessler attempted to reassure investors that the negative impact from the Monterrey Facility's closure would be limited to the first half of 2023, stating that the Company: "expect[ed its] second half sales volumes to recover as [the Company] move[d] past the Monterrey suspension driven uncertainty."

173.     On April 28, 2023, the Company issued a press release disclosing the Company's financial and operational results for quarter ended March 31, 2023. The Company filed this press

release with the SEC as an exhibit attached to a Form 8-K signed by Defendant Flanagan (the "April 2023 Press Release"). The April 2023 Press Release informed investors that "[i]n the second half of the year, [the Company] anticipate[s] sales volumes will further recover, as we move past Monterrey suspension-driven uncertainty " During an earnings call that same day, Defendant Halford likewise stated that in "the second half of the year, [the Company] anticipate[d] [its] sales volume will further recover as we move past Monterrey suspension driven impact."

174.    The statements detailed above were materially false and misleading when made because they continued to conceal Defendants' awareness that the closure of the Monterrey Facility, the Company's sole producer of pin stock, resulted in significant, persistent negative consequences for the Company's business operations and performance entering 2023.

### *The Truth Fully Emerges*

175.    On August 4, 2023, Defendants reported the Company's results for the second quarter of 2023 and held an earnings call to discuss them. These disclosures reported, among other things, a net loss of $8 million for the quarter, driven by a 49% year-over-year decline in sales as GrafTech continued to "recover" from the Monterrey Facility's shutdown. During the question-and-answer portion of the earnings call, Defendant Kessler labeled the Monterrey Facility closure a "key driver" of the Company's continuing underperformance. Kessler continued:

> . . . In regards to the impact of Monterrey, and I think we've talked about that in some detail on the last 2 calls, right? During that suspension in late 2022, right? We lost the ability to negotiate volumes, especially for the first half of '23 and maybe even to some extent in the second half, right? So that was the worst possible time for that suspension. So that is really the key driver of the impact and underperformance and the disconnect between what you're highlighting here, the steel utilization rates versus the electro plant utilization rate. I think it's the indirect impact of Monterrey, the loss of that negotiation window during the most critical negotiation time in late 2022.

176.    On this news, the price per share of the Company's common stock plummeted nearly 23%, or $1.18 per share, from a closing price of $5.23 per share on August 3, 2023, to close

at $4.05 per share on August 4, 2023.

*Share Repurchases During the Relevant Period*

177. During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $400,962,259 to repurchase approximately 34,701,483 shares of its own common stock at artificially inflated prices between August 2019 and June 2022. These repurchases include:

A. Between August 1, 2019 and August 31, 2019, the Company repurchased 879,134 shares of its own common stock at an average price per share of approximately $10.79, for a total cost to the Company of approximately $9,485,856.

B. Between October 1, 2019 and October 31, 2019, the Company repurchased 125,551 shares of its own common stock at an average price per share of approximately $11.01, for a total cost to the Company of approximately $1,382,317.

C. Between December 1, 2019 and December 31, 2019, the Company repurchased 19,047,619 shares of its own common stock at an average price per share of approximately $13.13, for a total cost to the Company of approximately $249,999,999.

D. Between January 1, 2020 and January 31, 2020, the Company repurchased 104,646 shares of its own common stock at an average price per share of approximately $11.01, for a total cost to the Company of approximately $1,152,152.

E. Between February 1, 2020 and February 29, 2020, the Company repurchased 1,449,675 shares of its own common stock at an average price per share of approximately $10.80, for a total cost to the Company of approximately $15,656,490.

F. Between March 1, 2020 and March 31, 2020, the Company repurchased 1,774,253 shares of its own common stock at an average price per share of approximately $7.49, for a total cost to the Company of approximately $13,289,155.

G. Between August 12, 2021 and August 31, 2021, the Company repurchased 1,104,576 shares of its own common stock at an average price per share of approximately $10.75, for a total cost to the Company of approximately $11,874,192.

H. Between September 1, 2021 and September 30, 2021, the Company

58

repurchased 3,189,348 shares of its own common stock at an average price per share of approximately $10.77, for a total cost to the Company of approximately $34,349,278.

I.  Between October 1, 2021 and October 31, 2021, the Company repurchased 364,260 shares of its own common stock at an average price per share of approximately $10.32, for a total cost to the Company of approximately $3,759,163.

J.  Between February 1, 2022 and February 28, 2022, the Company repurchased 1,015,036 shares of its own common stock at an average price per share of approximately $9.79, for a total cost to the Company of approximately $9,937,202.

K.  Between March 1, 2022 and March 31, 2022, the Company repurchased 2,020,794 shares of its own common stock at an average price per share of approximately $9.93, for a total cost to the Company of approximately $20,066,484.

L.  Between May 1, 2022 and May 31, 2022, the Company repurchased 3,019,813 shares of its own common stock at an average price per share of approximately $8.28, for a total cost to the Company of approximately $25,004,052.

M.  Between June 1, 2022 and June 30, 2022, the Company repurchased 606,778 shares of its own common stock at an average price per share of approximately $8.25, for a total cost to the Company of approximately $5,005,919.

178.    As the Company's stock was actually worth only $4.05 per share, the price at closing on August 3, 2023, the Company overpaid by approximately $260,421,253 between August 2019 and June 2022.

***Insider Sales***

179.    During the Relevant Period, while the Company's stock price was artificially inflated before the scheme was exposed, certain Defendants made insider sales of Company stock with knowledge of material nonpublic information before the material misstatements and omissions complained of herein were exposed, demonstrate his motive in facilitating and participating in the scheme.

180.    During the Relevant Period, Defendant Rintoul made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 21, 2020 | 4,049 | $6.16 | $24,941.84 |
| February 25, 2021 | 4,731 | $12.09 | $57,197.79 |
| March 21, 2021 | 4,195 | $11.83 | $49,626.85 |
| May 27, 2021 | 91,409 | $13.16 | $1,202,942.44 |
| November 8, 2021 | 45,750 | $12.86 | $588,129.98 |

181.    During the Relevant Period, Defendant Flanagan made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 25, 2023 | 3,717 | $5.60 | $20,815.20 |

182.    During the Relevant Period, Defendant Halford made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| May 1, 2020 | 3,717 | $7.97 | $24,970.01 |
| May 1, 2021 | 4,451 | $12.72 | $57,761.52 |
| May 27, 2021 | 44,216 | $13.16 | $581,882.56 |
| February 25, 2023 | 3,922 | $5.60 | $21,963.20 |

183.    During the Relevant Period, BCP Holdings made the following sales of Company common stock:

[Table continued to next page.]

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| December 2019 | 30,223,546 | $13.13 | $396,684,041 |
| October 2020 | 1,706,014 | $7.20 | $12,326,529.01 |
| November 2020 | 10,408,931 | $7.61 | $75,061,572.10 |
| December 2020 | 12,538,460 | $9.28 | $112,717,150.38 |
| January 2021 | 20,000,000 | $10.72 | $214,400,000 |
| March 2021 | 30,000,000 | $11.67 | $350,100,000.00 |
| May 2021 | 32,800,000 | $13.17 | $432,856,000.00 |

184.    Thus, in total, these defendants breached their fiduciary duties by engaging in lucrative insider sales of Company common stock at artificially inflated prices, obtaining combined proceeds of over $1.5 billion.

***Harm to the Company***

185.    As a direct and proximate result of the Individual Defendants' misconduct, GrafTech has lost and expended, and will lose and expend, millions of dollars.

186.    Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and certain Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

187.    Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

188.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, including the Dust Emissions Misconduct, and payments of any fines or settlement amounts associated with the Company's violations.

189.    Such losses losses include the Company's overpayment of approximately $260.4 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

190.    Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

191.    As a direct and proximate result of the Individual Defendants' conduct, GrafTech has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and gross mismanagement.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

192.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants and The Brookfield Defendants' fiduciary duties as controlling shareholder

193.    GrafTech is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

194.    Plaintiff is a current shareholder of GrafTech and was a continuous shareholder of the Company at all relevant times.  Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

195.    A pre-suit demand on the Board of GrafTech is futile and, therefore, excused.  At the time this action was commenced, the eight-person Board consisted of Individual Defendants Flanagan, Keizer, Dumas, Fine, Germain, and Taccone (the "Director Defendants"), along with nonparties Sachin Shivaram and Eric V. Roegner.  Accordingly, Plaintiff is only required to show that four current Directors cannot exercise independent objective judgment about whether to bring

this action or whether to vigorously prosecute this action. As set forth below, all of the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

196.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

197.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

198.    Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

199.    Furthermore, the Director Defendants knowingly or recklessly caused the Company to engage in the Dust Emissions Misconduct. This renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

200.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of

information pertaining to the Company's core operations and the material events giving rise to these claims.  Specifically, as Board members of GrafTech, the Director Defendants knew, or should have known, the material facts surrounding GrafTech's financial condition and internal control mechanisms.

201.    In further abdication of their duties, the Director Defendants caused the Company to overpay by approximately $260,421,253 for repurchases of its own common stock during the Relevant Period while the Company's stock price was artificially inflated due to the false and misleading statements and Dust Emissions Misconduct alleged herein.

202.    The fraudulent scheme was, *inter alia*, intended to obscure GrafTech's noncompliance with local environmental laws and regulations at its Monterrey Facility, its sole producer of pin stock, and the subsequent disruption to its business operations and financial performance in order to make the Company appear more profitable and financially stable to investors. Moreover, the Director Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

203.    Defendant Flannagan has served as the Company's CEO since March 26, 2024 and as member of the Board since 2021. According, and as the Company admits, Defendant Flanagan is not an independent director. As GrafTech's highest officer, and a trusted Company director, Defendant Flanagan conducted little, if any, oversight of the Company's engagement in the schemes to make false and misleading statements, or its engagement in the Dust Emissions Misconduct, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.

Defendant Flanagan is also named as a defendant in the Securities Class Action. Moreover, Defendant Flanagan's insider sales, made while the Company's stock prices were artificially inflated because of the false and misleading statements alleged herein, further demonstrate his motive to participate in the scheme. For these reasons, too, Defendant Flanagan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him his futile and, therefore, excused.

204.     Moreover, the Director Defendants signed numerous SEC filings containing materially false and/or misleading statements, exposing them to significant liability. Accordingly, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile, and, therefore, excused.

205.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

206.     Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.  As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

207.     Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

208.     Defendants Dumas, Defendant Fine, and Defendant Keizer (the "Audit Defendants") serve on the Company's Audit Committee, and pursuant to the Audit Committee

Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting.  At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above.  Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

209.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct.  The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct.  The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

210.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf

of the shareholders of the Company. Accordingly, demand is excused as being futile.

211.    Accordingly, a pre-suit demand on the Board is futile and excused.

### COUNT I
**Against the Individual Defendants for Violations of Section 10(b) and
Rule 10b-5 of the Exchange Act**

212.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

213.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding GrafTech. Not only is GrafTech now defending claims that is violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon GrafTech by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase approximately 34.7 million shares of its own shares at artificially inflated prices, damaging GrafTech.

214.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

215.    The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in

order to make the statements made about GrafTech not misleading.

216. The Individual Defendants as top executives acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

217. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

### COUNT II
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

218. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

219. The Individual Defendants, by virtue of their positions with GrafTech and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of GrafTech and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause GrafTech to engage in the illegal conduct and practices complained herein.

220. Plaintiff, on behalf of GrafTech, has no adequate remedy at law.

## COUNT III
**Against the Individual Defendants**
**For Breach of Fiduciary Duty**

221.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

222.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

223.    Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

224.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

225.    Specifically, breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and/or misleading statements, including, *inter alia*, that: (1) the advantages of the Company's purportedly low cost structure were in large part due to GrafTech's blatant disregard of applicable environmental laws and regulations at the Monterrey Facility; (2)

69

despite claiming that the Company was actively pursuing an environmentally conscious agenda set on legal compliance, it was actively engaging in such blatant disregard of applicable environmental laws and regulations; (3) the St. Marys Facility was not producing or capable of producing pin stock, and would require a minimum of 18-24 months to ramp up production thereof; (4) because the St. Marys Facility could not produce pin stock, the Monterrey Facility was the company's sole source of pin stock for all of its operations; and (5) the closure of the Monterrey Facility, the Company's sole producer of pin stock, resulted in significant, long-lasting negative consequences for the Company's business operations and performance entering 2023. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

226. In further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase more than 34 million shares of its own common stock at artificially inflated prices before the fraud was exposed, while Defendants Rintoul, Flanagan, Halford, and BCP IV Holdings engaged in insider sales of approximately $1.5 billion while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

227. In yet further breach of their fiduciary duties, Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

228. The Individual Defendants had actual or constructive knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the

Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

229.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

230.    The Brookfield Defendants, in breach of its fiduciary duties as a controlling shareholder, caused the Company to enter into various agreements favorable to its own financial interests, including two share repurchase agreements shortly before and during the Relevant Period, which required the aggregate repurchase by GrafTech of approximately 31 million shares of its own common stock from The Brookfield Defendants while the Company's stock was trading at artificially inflated prices as a result of Defendants' false and/or misleading statements to the investing public.

231.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

232.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

233.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide

damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

234.     Plaintiff, on behalf of GrafTech, has no adequate remedy at law.

**COUNT IV**
**Against the Individual Defendants for Unjust Enrichment**

235.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

236.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, GrafTech.

237.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from GrafTech that was tied to the performance or artificially inflated valuation of GrafTech, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

238.     Plaintiff, as a shareholder and a representative of GrafTech, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

239.     Plaintiff on behalf of GrafTech has no adequate remedy at law.

**COUNT V**
**Against the Individual Defendants for Waste of Corporate Assets**

240.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

241.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It

72

resulted in continuous, connected, and ongoing harm to the Company.

242.     As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

243.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

244.     Plaintiff, on behalf GrafTech, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.     Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.     Awarding punitive damages;

D.     Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

DATED: June 13, 2025                    **EMPLOYMENT LAW PARTNERS, LLC**

By: */s/ Stuart G. Torch*
Stuart G. Torch (0079667)
David N. Truman (0082347)
4700 Rockside Road, Suite 530
Independence, Ohio 44131
Telephone: (216) 382-2500
Fax: (216) 381-0250
stuart@employmentlawpartners.com
david@employmentlawpartners.com

*Local Counsel for Plaintiff*


**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky (*pro hac vice* anticipated)
Robert R. Ayers (*pro hac vice* anticipated)
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: sdr@rl-legal.com
rra@rl-legal.com


**GRABAR LAW OFFICE**
Joshua H. Grabar (*pro hac vice* anticipated)
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com


*Lead Counsel for Plaintiff*

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury on all claims set forth herein.

*/s/ Stuart G. Torch*
Stuart G. Torch (0079667)

*One of the attorneys for Plaintiff*
